IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

| | |
|---|---|
| DONALD LEE TAYLOR,        ) | |
|     Plaintiff,        ) | |
|                    ) | |
| v.        ) | CIVIL ACTION NO. 5:03-2075 |
|                    ) | |
| MARY YELINEK,        ) | |
| Medical Administrator, *et al.*,        ) | |
|     Defendants.        ) | |

**PROPOSED FINDINGS AND RECOMMENDATION**

On August 18, 2003, Plaintiff, an inmate at the Mount Olive Correctional Complex [MOCC], and acting *pro se*, filed his Complaint in this matter pursuant to 42 U.S.C. § 1983, alleging violations of his civil and constitutional rights.[1] (Document No. 1.) Essentially, Plaintiff alleges that the Defendants were deliberately indifferent to his serious medical condition in violation of his rights under the Eighth Amendment of the United States Constitution. By Orders filed on August 18, 2003, and September 30, 2004, this matter was referred to the undersigned United States Magistrate Judge for the submission of proposed findings of fact and a recommendation for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (Document Nos. 4 and 33.)

**PROCEDURE AND FACTS**

In November, 1999, Plaintiff was diagnosed with Hepatitis C (HCV) and his liver enzymes since then have been monitored and are persistently elevated. (Document No. 1, p. 5, ¶ 10.) Plaintiff underwent a liver biopsy in April, 2001, which indicated that he suffered from increased portal inflammation with feathery changes beginning to manifest in his liver. (Id., ¶ 12.) On May 9, 2001,

---

[1] Because Plaintiff is acting *pro se*, the documents which he has filed in this case are held to a less stringent standard than if they were prepared by a lawyer and therefore, they are construed liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

Plaintiff was determined to be a candidate for HCV treatment therapy, beginning with a weekly injection of Peg-Interferon (Pegylated Interferon) treatments in June, 2001.[2] (¶ 13.) Eight months into the Peg-Interferon treatments, Plaintiff failed to respond to the therapy.[3] (¶ 14.) In February, 2002, he

---

[2] Plaintiff attaches to his Complaint a copy of the June, 2003, HCV Advocate, a monthly newsletter of the Hepatitis C support project, which summarizes the standard of care for HCV patients as follows:

> Pegylated interferon and ribavirin is now the standard of care for the treatment of hepatitis C. There are two available pegylated interferon combinations, Peg Intron (pegylated interferon alpha 2B - Schering Plough) plus Rebetol (Schering's branded ribavirin) and Pegasys (pegylated interferon alpha 2a - Roche) plus Copegus (Roche's branded ribavirin).
>
> * * *
>
> Peg Intron is the result of earlier pegylation technology using a smaller linear peg that weakly attaches to the interferon molecule, which is the reason that Peg Intron comes in a powdered form that requires reconstitution - it is unstable. This type of pegylation helped in the fact that Peg Intron doesn't need to be dosed three times a week, but it still acts similarly to standard interferon with periods at the end of each week where there is no detectable Peg Intron. It has not been determined how much itnerferon is needed to suppress the hepatitis C virus but one could theorize that if there is no drug in the body of someone with a high viral load - there is an opportunity for the virus to replicate, mutate and bounce back. This may explain the lack of improvement in response rates of Peg Intron over standard interferon in patients with a high viral load regardless of genotype.
> 　　Pegasys on the other hand is the result of later pegylation technology which uses a larger branched peg that very tightly attaches to the interferon, which explains why it is stable enough to be made in a ready made liquid formulation - it is very stable. This type of pegylation provides Pegasys with constant suppression of the hepatitis C virus from the first does injected to when therapy is completed. Levels of Pegasys gradually increase until around week 5-8 when steady state is established We know that the hepatitis C virus replicates trillions of virions a day and that constant suppression of the virus is critical, especially in patients with a high viral load (> 2 million copies/ml).

(Document No. 1, Exhibit 4.)

[3] Dr. R. Slade, CMS, advised Plaintiff at the outset that if did not respond to the treatment within a certain period of time, usually within three to six months, the treatment would be stopped. (Document No. 1, Exhibit 1, May 9, 2001, Memo to Plaintiff from Dr. Slade.)

began combination therapy which consisted of weekly shots of Peg-Interferon plus Ribavirin or Rebetol, given twice a day in capsule format. (¶15.) Plaintiff responded to the combination therapy within three months and his therapy continued for twelve months, as scheduled. (Id.) Plaintiff alleges however, that the Defendants "routinely 'skipped' [his] weekly treatment shots (for weeks at a time) giving the virus time to 'replicate' or ('bounce back each time treatment shots were skipped and untimely delayed')." (¶ 16.) Plaintiff relapsed within a month after the combination therapy ended. (Id.) Plaintiff states that according to the HCV Advocate, a monthly newsletter of the Hepatitis C Support Project, patients who respond to treatments, then relapse, will generally respond again with continued therapy. (¶ 17.) He states that he is now left with one remaining course of treatment: pegasys plus copegus, which is administered through a weekly injection. (¶ 21.)

Plaintiff complains that Defendants Mary Yelinek and Correctional Medical Services [CMS] refused and failed to provide him "with the basic standards of medical care [and] treatment, [by] 'skipping' Plaintiff's weekly treatment shots of Peg-Intron, failing and refusing to provide Plaintiff with continued treatment, re-evaluation of treatment, re-treatment, follow-up care or otherwise." (¶ 26.) He claims that their actions constitute "gross negligence, callous inattention, and deliberate indifference . . . to his serious medical needs for his Hepatitis C liver disease." (¶ 27.) As a result of the Defendants' conduct Plaintiff avers that he has suffered and continues to suffer, the following injuries:

> (a) extensive liver damage, (b) increased infection, (c) permanent physical damages to Plaintiff's overall health in that the vitality of Plaintiff's health is now permanently ruined, (d) loss of ability to enjoy life, (e) extreme physical mental/emotional pain and suffering (past and future), (f) humiliation, stigmatization and substantial other injuries for which Plaintiff Donald Lee Taylor is entitled to recover [for these] 'civil rights violations!'

(¶¶ 28, 33.) Additionally, Plaintiff notes on the bottom of a lab report dated March 17, 2003, that he

"has lost nearly (25 lbs.) and suffers extremely from body aches and pains both physical and mental." (Document No. 1, Exhibit 2.) Plaintiff seeks compensatory and punitive damages and any declaratory relief the Court deems appropriate. (Document No. 1, ¶¶ 34-36.)

On March 8, 2004, Defendant Mary Yelinek filed her Answer to Plaintiff's Complaint and Defendant CMS filed its Answer and Motion to Dismiss and Memorandum in Support. (Document Nos. 18-20.) CMS states that it is a private corporation providing health care to inmates in the custody of the West Virginia Division of Corrections [W.Va. DOC], which employs Defendant Mary Yelinek. (Document No. 20, ¶ 2.) CMS further states that Plaintiff is claiming that "defendants should have provided him with different treatment for his hepatitis C" but his only "claim against CMS is that its employees should have treated him differently and that CMS is responsible for the acts or omissions of its employees" under the doctrine of *respondeat superior*. (Id., ¶¶ 3, 6.) As such, to state a valid claim under § 1983 against CMS, Plaintiff "must allege facts that would demonstrate that CMS instituted official policies that deliberately denied him necessary medical care" which Plaintiff has failed to do. (¶ 8.) Accordingly, CMS must be dismissed for Plaintiff's failure to state a claim against CMS upon which relief can be granted.[4] (Id.)

---

[4] On February 24, 2004, Defendants, Jim Rubenstein, Commissioner, W.Va. DOC; Thomas McBride, Warden, MOCC; MOCC; and the W.Va. DOC [the State Defendants], by counsel, Charles Houdyschell, Jr., Assistant Attorney General, filed their Waiver of Reply and Alternative Motion to Dismiss and Memorandum in Support. (Document Nos. 14-15.) The State Defendants contend that Plaintiff's Complaint must be dismiss because (1) the Court lacks subject matter jurisdiction over MOCC and the W.Va. DOC pursuant to the Eleventh Amendment, (2) they are entitled to qualified immunity, and (3) Defendants Jim Rubenstein and Warden Thomas McBride cannot be liable as supervisors on the basis of the doctrine of *respondeat superior*. (Document No. 15.) Specifically, Defendants Jim Rubenstein and Thomas McBride aver that they relied on the "medical judgments of the health care professionals at the prison. The course of treatment outlined by the medical administrators['] response to the plaintiff's grievance hardly reflects treatment 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness' in violation of the Eighth Amendment." (Id., p. 8.) By Order entered September 30, 2004, the State Defendants were dismissed from this civil action. (Document No. 33.)

By Orders entered February 27, 2004 (Document No. 16.), and March 11, 2004 (Document No. 21.), Plaintiff was advised pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), of his right to file a response to the Defendants' Motions. Plaintiff filed his Motion to Amend his Complaint on April 8, 2004, seeking to claim that Defendants not only maintained unconstitutional "customs and practices," but also unconstitutional "policies" as stated in paragraphs eight and nine of his Complaint. (Document No. 24.) The addition of the term "policies" is the only change to his initial Complaint. (Id.) On April 14, 2004, he filed his Response to the Defendants' Motions to Dismiss. (Document No. 25.) With respect to CMS' Motion to Dismiss, Plaintiff states that he is not "merely disagreeing with the type of treatment he received, in fact [he] 'agreed' to be treated with both Peg-Interferon and Peg-Interferon plus Ribavarin." (Id., 2.) He is claiming however, that "the basic standard of reasonable care was not followed" when his weekly shots were skipped for weeks at a time. (Id.) Plaintiff attaches to his Response his Declaration and copies of the grievances he filed with respect to his skipped treatments. (Id., Exhibit B.) Plaintiff's Exhibits indicate that he filed a G-1 Grievance Form on September 12, 2002, to Captain Woods, his Unit Manager and Defendant Mary Yelinek, complaining that he missed his weekly treatment to be administered on September 11, 2002. (Exhibit B, p. 5.) By response dated September 18, 2002, Defendant Mary Yelinek advised:

> Due to change over from one Regional Medical Director to another several of the specialized drug orders were not filled in a timely manner. Your medication (Peg) should be received today and your weekly injection given this p.m. In reviewing the therapy, your missed dose last week should have no significant effect.

(Id.) On October 2, 2002, Plaintiff filed another G-1 Grievance Form to Captain R. Nottingham and Defendant Mary Yelinek complaining that he missed his treatment scheduled for that day and stating that "it's becoming a routine practice that my scheduled treatments are being skipped, delayed, or denied for weeks at a time when such are to be received once a week." (Id., p. 4.) Defendant Mary

Yelinek responded to his grievance on October 14, 2002, advising him to "refer to your two (2) previous G-1's on this subject. (Id.) Plaintiff states that on two occasions in October and November, 2001, he missed his weekly shot which caused his liver to become inflamed and his liver enzymes elevated. (Document No. 25, ¶ 3 and Exhibit D.) In May, 2003, Plaintiff filed further grievances and appeals complaining *inter alia*, that he has received inadequate medical care and treatment. (Document No. 25, Exhibit B, pp. 12-14.) On May 16, 2003, Defendant Mary Yelinek responded to Plaintiff's complaints, in pertinent part, as follows:

> (2) Your course of Peg/Ribo was completed without improper management. The outcome is as expected which you were made aware of at the start of same. There is no cure.
>
> (3) The Hep. C physician who has followed your case throughout treatment [Dr. R. Slade, an outside physician] has no recommendations for further treatment - not [through] Federal, CDC or other Hep. C programs. Your "relapse" is "normal" currently.

(Id., p. 14.) As the corporation providing medical services to MOCC inmates and the entity employing Defendant Mary Yelinek, Plaintiff contends that Defendant CMS was responsible for providing his medical care and treatment.

Plaintiff filed his Response to CMS' Reply on May 7, 2004. (Document No. 28.) Plaintiff states that although he does not presently have a copy of the contract entered into between CMS and MOCC, such contract and MOCC Operational Procedures indicate that Defendant Mary Yelinek, a CMS employee, maintains "final policymaking authority for CMS." (Id., p. 2.) Consequently, Plaintiff asserts that Defendant CMS must not be dismissed as a party Defendant in this civil action. (Id., pp. 2-3.)

On September 30, 2004, the undersigned entered Proposed Findings and Recommendation that the District Court find that Plaintiff has alleged facts, which if true, could establish that he was denied

adequate medical care when his weekly injection treatments were skipped and delayed due in part, "to change over from one Regional Medical Director to another." (Document No. 25, Exhibit B, p. 5.) The undersigned further found and recommended:

> From the record, it is clear that at least once a month for the months of September, October, and November, 2001, Plaintiff's treatments were skipped entirely and on other occasions his treatments were delayed by days. Although CMS may be correct in stating that his delayed and skipped treatments may have spanned only a few months in duration, Plaintiff has alleged and may be able to further demonstrate that consistent and constant treatment was critical to his success in the treatment program. Accordingly, to the extent that Plaintiff alleges an Eighth Amendment claim arising out of the change in Medical Administrators, the undersigned finds that his claims against CMS are not under the theories of *respondeat superior* or supervisory liability and CMS' Motion to Dismiss in this respect must be denied at this time.[5]

(Id., pp. 12-13.) By Order entered September 30, 2004, the District Court adopted the undersigned's Proposed Findings and Recommendation and denied Defendants' Motion to Dismiss. (Document No. 33.) A Time Frame Order was entered October 5, 2004, allowing the parties time to conduct discovery and file Motions for Summary Judgment. (Document No. 35.)

On January 27, 2005, Defendants Mary Yelinek and CMS filed their Motion for Summary Judgment and Memorandum in Support, together with Defendant Mary Yelinek's Affidavit and copies of Plaintiff's medical records. (Document Nos. 48-50.) The Defendants contend that they are entitled to judgment as a matter of law because Plaintiff has failed to establish Defendant Mary Yelinek's deliberate indifference to his serious medical needs. (Document No. 49, pp. 3-4.) Defendants further contend that Plaintiff failed to demonstrate that Defendant Mary Yelinek acted in a manner pursuant to an official policy or custom for which she can be held liable under a theory of supervisory liability. Specifically, Defendant Mary Yelinek a registered nurse, contends that although she was employed

---

[5] The undersigned notes that to the extent Plaintiff's claims against CMS are solely based upon their employer-employee relationship with Defendant Mary Yelinek, his claims must fail under the theories of *respondeat superior* and supervisory liability.

7

by Defendant CMS from February 7, 2000, through June 25, 2004, as the Health Services Administrator at MOCC, she did not provide clinical care to any inmate, including Plaintiff. (Document No. 50, ¶ 3.)

> As a registered nurse, I do not diagnose ailments such as hepatitis C and I do not decide which course of treatment is appropriate for such diseases. Only a physician can diagnose this disease and prescribe treatment for it. Nurses who provide clinical care to patients do so at the direction of physicians. Furthermore, as health services administrator, I was not responsible for providing clinical care to inmates such as Mr. Taylor. My duties were entirely administrative. I did not provide medications to inmates.

(Id.) With respect to Plaintiff's claim that his weekly injections were routinely skipped therefore, Defendant Mary Yelinek contends that he has failed to demonstrate that she ever denied Plaintiff medications that were prescribed by a doctor or that she knew he needed. (Document No. 49, p. 5.) Notwithstanding Plaintiff's claims that he routinely missed his injections, Defendants contend that his medical records demonstrate that he received his medications and "suffered only two isolated occurrences of missing medication." (Id.) These isolated instances however, do not arise to the level of an Eighth Amendment violation. (Id. and Document No. 50, pp. 4-5.)

Concerning the responses to Plaintiff's administrative remedies, Defendant Mary Yelinek states that she mistakenly advised Plaintiff that he had missed an injection on one occasion "because a change in medical administrators had caused a failure to order the medication in a timely fashion." (Document No. 50, p. 3.) Defendant Mary Yelinek alleges however: "Those were the facts as I understood them at the time after a review of the plaintiff's medication administration records and a conversation with the individual responsible for ordering new medications." (Id., p. 6.) She states:

> As I recall the situation, subsequent to authoring this response, I checked with the nursing staff about Mr. Taylor's medication situation. I discovered that some of the nurses were not documenting the provision of medication to the inmate in a correct manner. For instance, some nurses were entering the provision of peg-interferon in the physician's orders and/or in the medical records' progress notes. Upon discovering this

> situation, I instructed the staff to document medication correctly. At that time, the nursing staff completed the medication administration records in the correct fashion based either on other medical records or their memories. Those records indicate that the plaintiff received his peg-interferon on September 4, 12, 19, 27 and on October 4, 10, 18, 21, and 31. It is my understanding that the plaintiff received the proper medication on those dates notwithstanding any contrary inference that might be drawn from my response to his grievance.

(Id.) Defendants further contend that Plaintiff's Hepatitis C condition was being monitored by an outside physician, who advised that "a patient need not receive peg interferon every seven days on a rigorous schedule, but could receive it approximately every week and still experience the full effect." (Id., p. 4.)

By Order entered October 5, 2004, Plaintiff was advised pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), of his right to file a response to the Defendants' Motion. (Document No. 35.) Plaintiff filed on March 4, 2005, his Reply to the Defendants' Motion for Summary Judgment. (Document No. 51.) He attaches to his Reply, the following Exhibits: (A) Article from HCV Advocate, dated January, 2003 (Id., pp. 12-21.); (B) Article from HCV Advocate dated 2003 (Id., pp. 17-21); (C) Plaintiff's medical Progress Notes (Id., pp. 22-37.); (D) Physicians' Orders (Id., pp. 38-61.); (E) His Affidavit (Id., pp. 62-65.); (F) W.Va. DOC/MOCC Operational Procedures 4.35 through 4.37 (Id., pp. 66-78.); (G) Copies of his Administrative Remedies (Id., pp. 79-80.); (H) Copies of his Administrative Remedies (Id., pp. 81-85.); (I) "A Guide to Understanding Hepatitis C" (Id., pp. 85-105.); and (J-K.) Copies of his Administrative Remedies. (Id., pp. 107-110.) Plaintiff alleges that the Physicians' Orders and the Progress Reports are remarkably different in their notations of his receipt of the injections from the Medication Administration Records, thereby creating a genuine issue of material fact as to whether he received the injections in a timely manner. (Id., pp. 4-6.) In his Declaration, Plaintiff states that he missed injections in November and December, 2001, and that after February, 2002, the injections were given about every ten to twelve days as opposed to every week.

9

(Id., p. 2.) He further alleges that pursuant to Operational Procedures 4.35 through 4.37, it "is clearly established that 'the Health Service Administrator' is 'responsible' for the 'overall' health care at the Mt. Olive Correctional Complex." (Id., p. 7.) Because she "admits to review the program notes, physician order log entr[ies] of Plaintiff's peg-intron treatment distribution which means ('she knew or should have known') that Plaintiff's course of treatment was being 'botched." (Id., p. 7.)

On March 10, 2005, the Defendants filed their "Reply Brief in Support of Motion for Summary Judgment," alleging, in part, that Plaintiff's Exhibits A, B, F, and I, cannot be authenticated and therefore, constitute inadmissible hearsay. (Document No. 52.) The Defendants thus contend that these documents cannot be used to defeat their summary judgment motion. (Id., p. 2.) Defendants further contend that Plaintiff has failed to provide any "admissible evidence that Mary Yelinek knew about any routine 'skipping' of his hepatitis C medication, or any evidence that she ignored this problem." (Id., pp. 3-4.) With respect to the Operational Procedures, the Defendants do not dispute the policies' authenticity, but contends that the policies do not establish supervisory liability. (Id., p. 4.) Plaintiff has not produced any evidence that Defendant Mary Yelinek "had personal knowledge of a substantial risk of serious harm to the plaintiff and that she then failed to do anything about it." (Id.) Finally, Defendants argue that the medical records under either interpretation do not evidence deliberate indifference. (Id., p. 5.)

## THE APPLICABLE STANDARD

### Summary Judgment

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts

presenting a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356. Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim. Celotex, 477 U.S. at 322-23, 106 S.Ct. at 2552-53. Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

"[I]n order to withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged condition. The Eighth Amendment does not prohibit cruel and unusual prison conditions; it prohibits cruel and unusual punishments. If a prisoner has not suffered serious or significant physical or mental injury as a result of the challenged condition, he simply has not been subjected to cruel and unusual punishment within the meaning of the Amendment." Strickler v. Waters, 989 F.2d 1375, 1380-81 (4th Cir. 1993), cert. denied, 510 U.S. 949, 114 S.Ct. 393, 126 L.Ed.2d 341 (1993). In view of this standard, if no facts or inferences which can be drawn from the circumstances will support Plaintiff's Eighth Amendment claim viewing the evidence in a light favorable to Plaintiff, summary judgment is appropriate. If it is evident that there are genuine issues of material fact respecting the alleged infringement upon Plaintiff's Eighth Amendment right, summary judgment must be refused.

## ANALYSIS

### A.   Supervisory Liability.

A claim under 42 U.S.C. § 1983 must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated and (2) that the violation was committed by a person acting under the color of state law. 42 U.S.C. § 1983. An action for money damages may be brought against state agents acting under the color of their authority for injuries caused by their unconstitutional conduct. Proof of causation between the official's conduct and the alleged injury is necessary for there to be liability. A plaintiff asserting a claim under § 1983 must show the violation of a valid constitutional right by a person acting under color of state law. Liability under the doctrine of *respondeat superior* is generally inapplicable to actions arising under 42 U.S.C. § 1983. See Monell v. Department of Social Services of the City of NY, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Instead, liability is personal, based upon each defendant's own constitutional violations." Liability can be premised, however, "on a recognition that supervisory indifference or 'tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984), cert. denied sub nom., Reed v. Slakan, 470 U.S. 1035, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985). A plaintiff must show "a pervasive and unreasonable risk of harm from some specified source and that the supervisor's corrective inaction amounts to deliberate indifference or 'tacit authorization of the offensive [practices].'" Id. at 373. Evidence of a supervisor's continued inaction in the face of documented widespread abuses provides an independent basis for finding he either was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates. Id.

In their Motion, the Defendants contend that Plaintiff has not stated a valid claim under § 1983, of supervisory liability. The undersigned finds that Plaintiff has failed to specify any act taken by Defendants Mary Yelinek and CMS that violated his constitutional rights. Defendant CMS' prior Motion to Dismiss was denied, at least in part, based upon Plaintiff's claim that his Eighth Amendment rights were violated due to a change in Medical Administrators. The undersigned concluded that Plaintiff's claims were not predicated upon a theory of supervisory liability. Since then however, the Defendants have demonstrated through Plaintiff's medical records that he received the injections on at least a fairly consistent basis and that Defendant Mary Yelinek's responses to his administrative remedies were made prior to the realization that the nurses were improperly documenting his injections, which led her to believe that the injections were either delayed or not given because of a change in administration. The Defendants contend that Plaintiff has not demonstrated that the Defendants either were directly involved in his medical care and treatment, or that CMS had a policy or custom which denied needed medical treatment to inmates. Plaintiff argues however, that Defendant Mary Yelinek, as Health Services Administrator, was "responsible for the provision of the overall health care services at MOCC." (Document No. 51, Exhibit F, Operational Procedure 4.36.) He contends that Defendant Mary Yelinek failed to ensure that he received his weekly injections and follow-up care. In his Complaint, Plaintiff asserted that CMS is responsible for the acts or omissions of its employees. As discussed below, nothing about this medical treatment violated Plaintiff's constitutional rights and Defendants Mary Yelinek and CMS cannot be found to have tacitly authorized any unconstitutional medical care. Accordingly, Plaintiff has improperly brought this civil action against Defendants Mary Yelinek and CMS under the doctrine of *respondeat superior*, has failed to establish supervisory liability and therefore,

13

Defendants Mary Yelinek and CMS must be dismissed as Defendants in this civil action.

### B. Plaintiff has not stated an Eighth Amendment claim of deliberate indifference.

The Eighth Amendment protects against the infliction of "cruel and unusual punishments." As a general matter, prohibited punishments include those which "involve the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976)(*quoting* Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)). "It not only outlaws excessive sentences but also protects inmates from inhumane treatment and conditions while imprisoned." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). Thus under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), rev'd on other grounds, Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). See also Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994)(Supreme Court noted that the Eighth Amendment imposes certain duties upon prison officials to "ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"), *quoting* Hudson v. Palmer, 468 U.S. 517, 526 - 27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)); Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)(Court held that only those conditions depriving inmates of "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation). The Eighth Amendment "does not mandate comfortable prisons." Rhodes v. Chapman, 452 U.S. at 349, 101 S.Ct. at 2400. "To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." Id. at 347, 101 S.Ct. at 2399; Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995),

*citing* Hudson v. McMillian, 503 U.S. 1, 9, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992); Lopez v. Robinson, 914 F.2d 486, 490 (4th Cir. 1990). Sentenced prisoners are therefore constitutionally guaranteed adequate medical care under the Eighth Amendment.

To establish a violation of the Eighth Amendment in the context of a challenge to conditions of confinement, an inmate must allege (1) a "sufficiently serious" deprivation under an objective standard and (2) that prison officials acted with "deliberate indifference" to the inmate's health and safety under a subjective standard. Wilson v. Seiter, 501 U.S. 294, 297-99, 111 S.Ct. 2321, 2323-2325, 115 L.Ed.2d 271 (1991). A sufficiently serious deprivation occurs when "a prison official's act or omission . . . result[s] in the denial of the minimal civilized measure of life's necessities.'" Id. at 298, 111 S.Ct. 2321 (*citing* Rhodes v. Chapman, 452 U.S. at 347, 101 S.Ct. 2392)."In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements – that 'the deprivation of [a] basic human need was objectively sufficiently serious,' and that 'subjectively the officials act[ed] with a sufficiently culpable state of mind.'" Shakka v. Smith, 71 F.3d at 166 (*quoting* Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993)(quotation omitted)). See also White v. Gregory, 1 F.3d 267, 269 (4th Cir. 1993)("In *Strickler*, we held that a prisoner must suffer 'serious or significant physical or mental injury' in order to be 'subjected to cruel and unusual punishment within the meaning of the' Eighth Amendment.") A medical need serious enough to give rise to an Eighth Amendment claim involves a condition which places an inmate at substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment causes continuous severe pain. The Fourth Circuit stated the applicable standard in Miltier v. Beorn, 896 F.2d 848, 851-852 (4th Cir. 1990), as follows:

> To establish that a health care provider's actions constitute deliberate indifference
> to a serious medical need, the treatment must be so grossly incompetent, inadequate

15

> or excessive as to shock the conscience or to be intolerable to fundamental fairness. * * * Deliberate indifference may be demonstrated by either actual intent or reckless disregard. * * * A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position. * * * Nevertheless, mere negligence or malpractice does not violate the eighth amendment. (Citations omitted)

See also Sosebee v. Murphy, 797 F.2d 179, 183 (4th Cir. 1986)(Facts indicating that guards were aware that inmate's condition had worsened and was life-threatening and intentionally ignored the situation and refused to seek medical assistance provided a reasonable basis for finding deliberate indifference to inmate's medical needs.); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978), cert. denied, Moffitt v. Loe, 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980)(Pretrial detainee's allegations of delay in treatment of his broken arm indicated a reasonable basis for inferring deliberate indifference to his serious medical needs.); Russell v. Sheffer, 528 F.2d 318 (4th Cir. 1975)(Summary judgment for defendants affirmed where claim that inmate received constitutionally inadequate medical treatment involved a question of medical judgment not subject to judicial review.). First therefore, Plaintiff in this case must allege and eventually establish a "sufficiently serious" deprivation of adequate medical care and resulting "serious or significant physical or mental injury" in order to maintain and prevail upon his Eighth Amendment claim. Second, to establish the subjective component of deliberate indifference, Plaintiff must allege and prove each defendant's consciousness of the risk of harm to him. See Farmer, 511 U.S. at 840, 114 S.Ct. at 1980. In particular, Plaintiff must establish that each Defendant "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837, 114 S.Ct. at 1979. Plaintiff in this case must therefore allege and establish each Defendant's awareness that he was receiving constitutionally inadequate medical

care and disregard for the serious physical and mental consequences.

The allegations and factual background as it may be found in Plaintiff's Response to Defendants' Motion and the medical records submitted therewith and Defendants' Declarations and Exhibits do not present a claim of constitutional magnitude. Viewing the evidence favorably to the Plaintiff, the undersigned finds that Plaintiff has failed to demonstrate that the Defendants knew of and disregarded an excessive risk to his health and safety. The medical records reveal that beginning in 1999, Plaintiff was examined in Health Services on numerous occasions with respect to his Hepatitis C condition. (Document No. 51, Exhibits C-D, G-H, J-K and Document No. 49, Exhibits.) During his examinations, medical staff educated him on his condition and medications and actively sought treatment for him. In 2001, he was determined to be a candidate for HCV treatment therapy, which treatment begin in June, 2001, with weekly injections of Peg-Interferon (Pegylated Interferon). Eight months into the Peg-Interferon treatments, Plaintiff failed to respond to the therapy. In February, 2002, he began a combination injection therapy which was extended for a period of one year. After his treatment ended, Plaintiff was observed to be intoxicated, which is contraindicated after treatment for his liver condition. (Document No. 51, Exhibit J.) Larry Williamson, then CMS WV Medical Director, advised that "[r]etreatment should not be ordered under these circumstances alone." (Id.) The medical records attached to the Defendants' Motion reveal that his injections were not routinely skipped, as alleged by Plaintiff. Furthermore, to the extent that he claims Defendant Mary Yelinek is liable based upon her responses to his administrative remedies, the undersigned finds that her responses indicate that she checked with medical staff to see why he allegedly missed his injection and advised him when it would be administered. Defendants correctly assert that his reliance on medical staffs' responses, cannot form the basis of liability under Bivens. See Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990)("[It would be an unprecedented extension of the theory of supervisory liability

17

to charge these wardens, not only with ensuring that [the inmate] received prompt and unfettered medical care, but also with ensuring that their subordinates employed proper medical procedures - procedures learned during several years of medical school, internships, and residencies. No record evidence suggests why the wardens should not have been entitled to rely upon their health care providers' expertise.). The record otherwise indicates that Defendant Mary Yelinek had no personal involvement in his medical care. The undersigned therefore finds that the Defendants were not deliberately indifferent to his serious medical needs. The record reveals that Plaintiff was examined on many occasions and his condition was cautiously monitored by exams and medical testing, and treated with medications, when appropriate. In view of the foregoing, Plaintiff has failed to establish an Eighth Amendment claim of deliberate indifference. For these reasons, the undersigned finds that Plaintiff's Eighth Amendment claim fails because there is no evidence that Defendants acted subjectively with deliberate indifference to his serious medical needs. No facts or inferences can be drawn from the circumstances which present a genuine issue of material fact supporting Plaintiff's Eighth Amendment claims viewing the evidence in a light favorable to Plaintiff, and therefore summary judgment is appropriate.

### **PROPOSAL AND RECOMMENDATION**

The undersigned hereby respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS**, that the District Court **GRANT** the Defendants' Motion for Summary Judgment (Document No. 48.), **DISMISS** Plaintiff's Complaint, and **REMOVE** this matter from the Court's docket.

The parties are hereby notified that this "Proposed Findings and Recommendation" is hereby FILED, and a copy will be submitted to the Honorable Chief United States District Judge David A.

Faber. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have thirteen days (ten days, filing of objections and three days, mailing/service) from the date of filing of this Proposed Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.) cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, Chief Judge Faber, and this Magistrate Judge.

The Clerk of this Court is directed to file this "Proposed Findings and Recommendation" and to mail a copy of the same to counsel of record and to Plaintiff, *pro se*.

ENTER: August 31, 2005.

R. Clarke VanDervort
United States Magistrate Judge